[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This action, by Writ and complaint, claiming a decree of separation of the marriage, and a cross complaint, claiming a dissolution of the marriage of the parties and other relief as on file, came to this court on September 29, 1992, with a return day of October 20, 1992, and thence on later dates when the parties appeared for a limited contested trial held on November 4, 5, 9, 10, 16 and 17, 1993.
The court having heard the testimony, examined the exhibits and considered the arguments of counsel, concludes that the evidence indicate the following: The plaintiff, Diane L. Banis, and the defendant, Michael C. Perrone, were intermarried in Middletown, Connecticut, on August 16, 1969. The parties were members of the Jehovah's Witness[1] religious faith and they were married in a Kingdom Hall, the meeting and worship building of Jehovah's Witness. The plaintiff was baptized as a Jehovah's Witness in 1958. At the time of their marriage, the defendant had been a Jehovah's Witness since he had reached eleven or twelve years of age. The parties had known each other for about one and one-half years before marriage. The plaintiff, as well as the defendant, is a high school graduate. the parties have one child, a daughter, Stacey, who is an adult and lives with her mother in the marital residence. The marital residence is 269 Lyman Road, Wolcott. This is part of a duplex building, 267-269 Lyman Road. The plaintiff, as a result of a pendente lite order, was given the exclusive use of 269 Lyman Road. The defendant has his office at 267 Lyman Road. Since June or July 1992, the defendant has slept on a couch in his office. The office premises have been rented to Allstate and is the place where the defendant works as an insurance sale agent for CT Page 69 Allstate. He testified that his income is from commissions. According to the defendant's federal income tax return for 1992, his income from wages, salaries and tips was $99,469. His adjusted gross income was $108,546. The defendant testified that his income for 1993 would be substantially less than his 1992 income. The defendant's financial affidavit shows a gross weekly wage of $1,251.38, deductions 555.32, and a net weakly wage of $696.06. The defendant's financial affidavit also shows other weekly rental income of $162.79, and deductions of $273.69 (deductions for maintenance, $23.26; mortgage and taxes on rental office property, $232.55; sewer, $3.46; wells $2.88; and insurance, $11.54), leaving a total net weekly income of $585.16.
The plaintiff's 1992 income tax return indicated that she has a retail beverage coffee sales business. Her gross receipts are shown to be $18,158.00. Her gross income is shown to be $12,564.00. Her total expenses are shown to be $10,952.00. Her total net profit is shown to be $1,612.00. The plaintiff's financial affidavit indicates that her principal net income is the weekly alimony pendente lite award of $250.00. The financial affidavit also indicated that the plaintiff earns $57.69 per week as a casual laborer. This is a part time job. According to her financial affidavit, her total net weekly income is $246.46.
The plaintiff testified as to her health. She has a slight problem with a shoulder. She stated that she has a spur, pain and tendinitis in a shoulder, and that she is able to type about 25 words per minute. The defendant testified that the plaintiff is 48 years old and that he is 44 years old, and that his health is good. He stated that around 1977, he suffered a mental breakdown. As a result, the plaintiff testified that he slept a lot and she took care of the family as best as she could until the defendant recovered. The defendant testified that he resigned from the Jehovah's Witness religious organization in 1976. The organization found out that he was smoking and he was disfellowshipped.
Two sisters of the defendant who are Jehovah's Witnesses testified for the plaintiff, and each stated that the plaintiff was a good mother and good to the defendant. One sister, Jean Perrone, stated that she was disfellowshipped for four months in 1988, and when the defendant was disfellowshipped, she stopped talking to him. the defendant testified that his mother has not CT Page 70 spoken to him in about twelve years.
The plaintiff and the defendant practiced their religion together until about the mid-seventies. At that time, the plaintiff testified that the defendant decided that he no longer wanted to practice the requirements of the Jehovah's Witness faith. According to the plaintiff, some of his reasons were that they had a new baby, a new house, and they were young, and he no longer believed in the faith. She stated that although she has always believed in her faith, when the defendant discontinued their religion, he became obsessive and bitter, and this took an emotional toll on her. She then became inactive in her faith because she wanted peace in her home.
The defendant testified that the plaintiff was an inactive member of the Jehovah's Witness faith for about 14 years prior to 1991. During that time, the defendant stated that the marriage was satisfactory.
The plaintiff testified that between 1987 and 1991, they lived well, took many nice vacations together, and purchased many things for the house. She stated that they had an enjoyable life style. Also, she stated that she worked for the defendant in his office from about 1989 to April or March, 1991. The parties are in dispute about what pay, if any, the plaintiff received. The plaintiff testified that she came to work one morning in March or April, 1991, and the defendant told her that she was terminated. The defendant testified that the plaintiff overdrew their joint bank account and she came looking for the $200 per week allowance he gave her, and he told her that he did not have it and she quit. The defendant admits that the checks that the plaintiff received were made to their daughter, Stacey, and Stacey endorsed the checks over to the plaintiff. This procedure permitted the defendant to avoid paying Social Security for the plaintiff. He testified that she received an allowance and she was not on his payroll.
According to the testimony of the defendant, his marriage was alright until the plaintiff became reinvolved with the Jehovah's Witnesses. He describes the Jehovah's Witness religious organization as a cult, and he stated that he did all he could for two years to keep the plaintiff from becoming reinvolved with the organization. He testified about a social occasion that he and the plaintiff attended and the plaintiff refused to stand and sing the national anthem. He stated that CT Page 71 this devastated him.
He testified that he wrote letters and notes to the plaintiff critical of Jehovah's Witnesses. He also sent to the plaintiff critical writings and published articles about the organization. He sent the plaintiff a copy of a videotape that he made that is critical of Jehovah's Witnesses. Although the plaintiff considered his actions harassment, the defendant testified that his intent was to persuade the plaintiff to not again become involved with the Jehovah's Witnesses.
The plaintiff testified that the defendant has been harassing her for the past two years. In addition to sending her notes, books and critical writings, including his writings about her faith, she testified that the defendant became bitter and abusive. On some of the notes placed for the plaintiff to see, the defendant referred to the plaintiff as a prostitute, a slut and a "b__ch". She testified that the defendant has called her obscene names in the presence of her daughter and her father-in-law. The plaintiff testified that during the course of this trial, the defendant has put critical writings under the door of her home.
For a short time, the parties participated in counseling. Ultimately, however, the defendant discontinued counseling, claiming that it was the plaintiff, not him, that needed counseling. The defendant testified that there are five conditions the plaintiff needed to satisfy in order to reconcile the differences between them. He stated that the plaintiff must: 1) get out of the Jehovah's Witness; 2) obtain full employment; 3) pay back or return the money and valuables that she removed from his safe; 4) place her dogs away from their home; and 5) change her eating habits.
The defendant testified that presently he is not practicing any religious faith, and that he is not an atheist[2], but probably an agnostic.[3]
The court notes that although the plaintiff and the defendant were employed when they married, neither party had any other substantial asset. The property, real and personal, that is owned now was acquired during the 24 years of their marriage.
The trial of this matter extended over a portion of six days, with 48 exhibits presented by the plaintiff and CT Page 72 exhibits presented by the defendant. There is little, if anything, upon which the parties agree. Each party claims that the other is the cause for the breakdown of the marriage. The principal focus of the plaintiff is the defendant's behavior towards her and his dislike of her religion. The principal focus of the defendant is the plaintiff's religion and religious practices. The evidence indicates that when the parties met, each was a Jehovah's Witness, that they knew each other for approximately one and one-half years before marriage, they married in a Jehovah's Witness Kingdom Hall, and they practiced the Jehovah's Witness faith together for a substantial period after marriage. Because of the religious background of this marriage, it serves no useful purpose for either party to try to make religion or religious practices the cause for the breakdown of the marriage. The court declines to try to resolve the conflicting claims concerning religion and religious practices in this controversy. What is proper or improper about a religion must be left to the parties' private consciences.
Each party claims that the other is capable of earning more than is shown on his or her financial affidavit. The wife contends that the husband has a valuable and thriving insurance business and that Allstate gives him a substantial reimbursement for business expenses. The husband claims that the wife earns and can earn more than she reports on her business concerning fairs that she conducts.
It is the view of the court that whatever financial success that exists in this marriage which enables either or both parties to show or claim substantial assets, the success is the result of the contributions made by each party to the marriage. The court recognizes that the plaintiff worked full time during the marriage until shortly before Stacey was born. The court finds credible the testimony of the plaintiff that after Stacey's birth, the parties agreed that the plaintiff should take care of Stacey and work outside of the home only part time. The court also finds credible the plaintiff's testimony that she supported her husband's business ventures and investments. There is no credible evidence to indicate that as the defendant worked outside of the home, and the plaintiff worked in the home, that the defendant's earnings and investments were for his benefit alone and excluded the plaintiff as an equal marital partner.
The court has reviewed and considered all of the testimony, CT Page 73 the exhibits, the financial affidavits of the parties, their proposals for Judgment and the arguments of counsel. In addition, the court has taken into consideration all of the criteria provided in General Statutes Section 46b-81, the assignment of property and transfer of title statute; Section46b-82, the alimony statute, and Section 46b-62, the statute pertaining to orders for the payment of attorney's fees in certain actions.
Accordingly, the court orders as follows:
A decree of dissolution of the marriage as requested in the cross complaint shall enter on the grounds of irretrievable breakdown of the marriage.
AWARDS OF REAL PROPERTY
The values of the real property hereinafter awarded, and the equity therein noted are the values and equity shown in "Schedule C", attached to the plaintiff's financial affidavit and agreed to by the parties in open court on November 5, 1993.
1. The plaintiff is awarded the duplex located at 263-265 Lyman Road, Wolcott, Connecticut. This duplex is valued at $143,000, a mortgage of $85,000, and an equity amount of $58,000. It is ordered that within thirty (30) days from the date of this decree, the defendant shall transfer to the plaintiff his interest in this duplex. The plaintiff shall hold the defendant harmless for any indebtedness and mortgage payments due against this duplex after the date of transfer. The defendant is responsible for and ordered to pay all mortgage installments, taxes, liens and insurance payments due on the property up and until the date of transfer, and any mortgage installment, taxes, liens or insurance payments not paid by the date of transfer shall be deducted from the defendant's share of the net proceeds of the Plymouth property, ordered hereinafter to be sold, and the funds turned over to the plaintiff.
2. The defendant is awarded the duplex located at 267-269 Lyman Road, Wolcott, Connecticut. This duplex is valued at $150,000, it has a mortgage of $150,000, and equity in the amount of zero. Within thirty days of this decree, the plaintiff shall transfer to the defendant her interest in this duplex. The defendant shall hold the plaintiff harmless for any indebtedness and mortgage payments due against the property CT Page 74 before and after the date of transfer.
3. The lots owned by the parties and located on South Street, Plymouth, Connecticut, are valued at $100,000, no mortgage, and an equity of $100,000. It is ordered that this property be sold within thirty-six months from the date of this decree. After deduction of the customary closing costs, the net proceeds of the sale are to be distributed equally between the plaintiff and the defendant, provided the defendant owes the plaintiff no indebtedness under paragraph 1 above, nor does he owe any alimony arrearage as alimony is hereinafter awarded. Any indebtedness owed by the defendant under paragraph 1 above or for alimony as hereinafter awarded shall be deducted from the defendant's share of the net proceeds from the sale and the same turned over to the plaintiff.
4. The property, approximately 16 acres, located in Clinton, New York, is valued at $20,000, no mortgage and an equity of $20,000. It is ordered that this property be sold within twenty-four months from the date of this decree. After customary closing costs, the net proceeds of the sale are to be distributed equally between the plaintiff and the defendant.
The amount of any encumbrance or indebtedness placed by either party against either piece of property referred to in paragraphs 3 and 4 above shall be charged against that party's share of the net proceeds from the property sale.
In the event that the parties are unable to agree on a price to offer for sale either piece of property referred to in paragraphs 3 and 4 above, or whether to accept the amount offered to purchase either piece of property referred to in paragraphs 3 and 4 above, either party may return to the court for a determination of an appropriate price to offer either piece of property for sale, or a determination of the appropriateness of the purchase price offered for either piece of property in light of the then contemporary real estate market conditions.
5. The defendant has a real estate business investment with Attorney Brian Borghesi which, according to the defendant's testimony, the property is worth $100,000. The defendant testified that there is indebtedness of $35,000 against this property, leaving a joint equity of $65,000. The defendant is awarded as his sole property all of his real estate business CT Page 75 investment with Attorney Borghesi.
OTHER PROPERTY
6. The plaintiff is awarded the 1987 Lincoln Town Car, valued by the defendant as worth $16,000. According to the defendant, there is no indebtedness against this automobile.
7. The defendant is awarded the 1988 Chevrolet Corvette, valued by the defendant as worth $14,000, with a loan balance of $16,000.
8. The defendant is awarded the 1987 Chevrolet Camaro, valued by the defendant as worth $3,000. According to the defendant, there is no indebtedness against this automobile.
9. The defendant is awarded the gold coins, valued by the plaintiff as worth $6,855.00.
10. The plaintiff is awarded the silver coins, valued by the plaintiff as worth $1,860, and the silver bullion bars, valued by the plaintiff as worth $3,341.00.
11. The plaintiff is awarded all of the Community Savings Bank stock, valued by the defendant as worth $1,700.00.
12. The defendant is awarded all other stock (stock other than the community Savings Bank stock) and all of the Series EE savings bonds, all valued at $2,000, according to the plaintiff's financial affidavit.
13. The plaintiff is awarded her jewelry, valued at $4,790, and her dogs, valued at $1,200, according to the plaintiff's financial affidavit.
14. The defendant is awarded his jewelry, valued at $4,000, and his guns, valued at $1,200, according to the plaintiff's financial affidavit.
15. The defendant presented a letter dated November 1, 1993, which was admitted in evidence as defendant's exhibit number 13. The letter is a response to his "request for the value of [his] Agents Pension Plan benefit." The "Valuation Date: October 31, 1993." "Benefit Amounts: Straight Life Annuity $15,006.00 a year." "Present Value Amount $55,212.00." CT Page 76 The letter indicates that had the defendant terminated his employment on October 31, 1993, the Straight Life Annuity would have become fully payable at his normal retirement date, July 31, 2014. According to the letter, the Present Value Amount would have been payable as a death benefit on October 31, 1993. Considering the plaintiff's health, education, employment history and skills, there is no evidence that at her age, she will be able to obtain employment that will provide her with pension benefits. Since the defendant has accumulated some pension benefits over the 24 years of marriage to the plaintiff, fairness and equity dictate that she be provided with some pension security for her comparable investment in the marriage. Accordingly, the plaintiff is awarded a Qualified Domestic Relations Order for forty percent (40%) of the defendant's pension. Counsel will draft the appropriate order and present the same to the court for execution at the time that the formal written Judgment is presented.
ALIMONY
16. The husband shall pay to the wife as alimony, the sum of $150.00 per week. Said alimony shall terminate upon the happening of the first of the following events:
a) the death of either party;
b) the wife's remarriage;
c) the wife's cohabitation under the statute;
d) three (3) years from the date hereof. This will give the wife the opportunity to complete any additional education or training that she may require in order to obtain more desirable employment and/or develop a productive and stable retail coffee beverage sales business at fairs.
MEDICAL INSURANCE
17. Subject to the termination provisions in this section hereinafter stated, if the wife does not have health insurance as an incident of her employment, the husband shall continue to carry the wife on his medical insurance policy which shall be equivalent to the medical insurance policy in existence for his benefit, subject to such restriction as may be applicable to any then pre-existing condition of the wife. The wife's inclusion CT Page 77 on the husband's insurance policy coverage shall be at his expense for the first eighteen (18) months from the date of this decree, and thereafter for the next eighteen (28) months, the husband shall be responsible for one-half (1/2) of the wife's medical insurance expenses and she shall reimburse the husband monthly for the remaining one-half of her medical insurance benefits expense.
For the first eighteen months of the wife's medical insurance coverage, the parties shall equally share the wife's unreimbursed medical insurance benefits expenses, thereafter for the next eighteen months, the wife shall pay her unreimbursed medical insurance expenses.
The husband's obligation under this section shall terminate upon the happening of the first of the following events:
a) the death of either party;
b) the marriage of the wife;
c) the cohabitation of the wife under the statute;
d) three (3) years from the date of this decree.
DEBTS AND LIABILITIES
17. The defendant husband shall be responsible for the payment of the indebtedness shown on his financial affidavit and for the $4,242.95 Bank Card Visa amount, shown on Schedule A attached to the plaintiff's financial affidavit and for one-half of the medical bills shown on Schedule B attached to the plaintiff's financial affidavit. Any funds received by the defendant as reimbursement for any of the Schedule B plaintiff's medical bills are to be applied to the plaintiff's medical bills indebtedness before payment of the unpaid balance is to be shared equally between the plaintiff and the defendant. The plaintiff is responsible for all of the other indebtedness shown on or attached to her financial affidavit.
OTHER ORDERS
18. Life insurance carried by the plaintiff or the defendant on the life of the other shall be immediately transferred to the insured and thereafter the insured shall be CT Page 78 responsible for the premium payments.
19. The furniture of the marital home is divided as currently held by the parties. The defendant is awarded his office furniture.
20. To the extent that the plaintiff has a retail coffee sales business in connection with her relationship with fairs, and to the extent that the defendant has an insurance sales business in his relationship with Allstate, each party is awarded her or his business without any interest of the other in said business.
21. The plaintiff is awarded counsel fees in the amount of $6,000.00. The awarded amount is to be paid within six months from the date of this memorandum.
GLASS, STATE TRIAL REFEREE